**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RONALD VENDETTI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 06 C 3556 |
| v. ) | |
| ) | Judge Marvin E. Aspen |
| COMPASS ENVIRONMENTAL, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER AND OPINION**

Presently before us are cross-motions for summary judgment filed by Plaintiff Ronald Vendetti ("Vendetti") and Defendant Compass Environmental, Inc. ("Compass"). Vendetti alleges that Compass breached his Employment Agreement ("Agreement") by requiring him to travel to Chicago two weeks per month. Compass argues that it did not breach the Agreement, and that even if it did, Vendetti may not recover because he breached the Agreement through his insubordination and failure to give Compass an adequate opportunity to cure. For the reasons set forth below, we grant Vendetti's motion and deny Compass's motion.[1]

**SUMMARY OF FACTS**

Compass is an environmental remediation contractor headquartered in Chicago. (Pl. Facts ¶1). On October 26, 2004, Compass acquired Williams Group International, also an environmental

---

[1] On November 16, 2007, the parties submitted a "Joint Suggestion of Partial Resolution" indicating that the parties have entered into an agreement with respect to Vendetti's stock and stock options and suggesting that we no longer need to consider this issue. Therefore, we will not address the portion of Vendetti's Motion for Summary Judgment that requests the market value of his shares and the difference between the exercise price and the market value of his vested options.

1

remediation contractor located in Stone Mountain, Georgia. (Pl. Facts ¶7; Def. Facts ¶4). Four Williams executives accepted employment with Compass after the acquisition, including Vendetti, who was hired as a controller. (Pl. Facts ¶9; Def. Facts ¶4, ¶7).

On October 26, 2004, Vendetti entered into an Agreement with Compass. (Compl. Ex. A). The agreement stated in relevant part:

> § 1(b): [Vendetti] shall initially have the duties, responsibilities and authority prescribed from time to time by the Board of Directors of [Compass]. [Vendetti] shall report to the Board of Directors of [Compass] (the "Board") which may, from time to time, further define [Vendetti]'s duties and responsibilities hereunder . . . . [Vendetti] agrees to devote his best efforts and substantially all of his business time, attention, energy, and skill to performing his duties to [Compass] under this Agreement.
>
> § 1©: Unless otherwise mutually agreed to, [Vendetti] shall be located in his current company office location (the "Principal Location") during the Term or such other office located within 45 miles of the Principal Location.
>
> § 5(f): [Vendetti] may terminate his employment for "Good Reason." "Good Reason" shall mean the occurrence and continuance for thirty days after written notice from [Vendetti] to the [Compass] of any material breach by the [Compass] of any provision of this Agreement after failing to cure such breach.
>
> § 6(b): In the event this Agreement is terminated pursuant to Sections 5(b), ©, (d) or (e)(ii), [Vendetti] shall not be entitled to any compensation for any period after the date of termination except for the continuation of medical coverage as required by law; provided, however, that [Vendetti] shall be to any accrued but unpaid obligations; provided, further, in the event [Vendetti] terminates this Agreement following the [Compass's] request to move his place of employment more than 45 miles from the Principal Location, the [Compass] shall pay to [Vendetti] severance pay equal to [Vendetti's] then existing Base Salary payable at such times and in such manner (including subject to all required deductions) for the 12-month period following the date of termination.[2]
>
> § 6(c): In the event this Agreement is terminated pursuant to [Section (f)], the [Compass] shall pay to [Vendetti] severance pay equal to the [Vendetti's] then existing Base Salary

---

[2] In accord with our March 2, 2007 Opinion, we interpret this section to apply to Defendant's "requests," as opposed to demands, that Vendetti relocate outside of the forty-five mile radius of Stone Mountain, Georgia. (Mar. 2, 2007 Opinion at 4).

payable at such times and in such manner (including subject to all required deductions) as would otherwise be payable in accordance with the terms of this Agreement as if termination had not occurred, for a period beginning on the date following the date of termination and ending twelve (12) months following the date of termination.

(Compl. Ex. A).

From April 2005 to July 2005, Compass installed a new accounting software system to integrate the Williams and Compass systems. Vendetti was in charge of installing and implementing this system and traveled to Chicago on four occasions to do this. (Pl. Facts ¶¶20-21; Def. Facts ¶¶16, 19). After the installation, Vendetti's duties were expanded to include handling accounting for all projects of Compass, not just those of Williams, and completing the monthly statements in connection with those projects. (Pl. Facts ¶22).

In November 2005, Compass hired a new CFO, Thomas Dubnicka (Pl. Facts ¶23; Def. Facts ¶21), who was described as more "hands on" than the previous CFO. (Def. Facts ¶22). During his first few months as CFO, Dubnicka made several requests that Vendetti travel to the Chicago office in order to assist with the month-end closing of the books. (Pl. Facts ¶26; Def. Facts ¶25). Vendetti came to Chicago as requested, but none of these visits lasted longer than three days. (*Id.*). In mid-March 2006 during a visit to the Chicago office, Dubnicka informed Vendetti that Compass was planning to terminate two of the Stone Mountain accounting personnel and that Vendetti needed to travel to Chicago to cross-train Chicago personnel on those employees' tasks, provide additional training to Vendetti's counterparts in the Chicago office, and help with the year-end audit and monthly closing. (Pl. Facts ¶27; Def. Facts ¶26). Dubnicka said that starting in April, he wanted Vendetti to be working two weeks per month in Chicago, and Vendetti expressed opposition to this amount of travel. (Pl. Facts ¶¶27-28).

3

As a follow-up, Dubnicka sent Vendetti an email on March 31, 2006 summarizing their meeting in order to "eliminate confusion" regarding what they discussed. (Pl. Facts ¶28; Def. Facts ¶32; Vendetti Depo. Ex. A). The email stated that Vendetti would provide work summaries of the work done by himself and the terminated Stone Mountain accounting personnel and would cross-train individuals in the Chicago office on these functions. (Vendetti Depo. Ex. A). Most significantly, the final paragraph on the email stated:

> Finally, beginning with April, you need to plan on being in the Chicago office <u>the last two weeks of each month to assist with the close and other accounting work that needs to be done</u>. At first this will include cross-training others on the work you do. I acknowledge that you expressed [sic] reluctance with this arrangement. However, after managing the finance and accounting function for the past several months, I have decided the most efficient means of completing the close and working on other necessary items and projects is to have you would of the Chicago office two weeks a month. Therefore, <u>you need to plan on being here the last two weeks each month for the indefinite future</u>.

(*Id.*) (emphasis added).

Dubnicka later confirmed in his deposition that the monthly closing was a recurring event every month by responding "Yes," when asked if it would be a correct statement to say that even after Vendetti's short-term training assignments were completed, "[Vendetti] would still have to be coming in to do the monthly close and fill out his two weeks per month with other functions as [Dubnicka] would come up with for him to do." (Dubnicka Depo. at 94, 97). On April 17, 2006 Vendetti responded to Dubnicka's March 31, 2001 email, sending a carbon copy to Battistoni, Compass's Chief Operating Officer, and commenting that he was "certain that [Dubnicka] and [Battistoni] have discussed the issue of my physical location in the past." (Pl. Facts ¶32; Compl. Ex. 3). Vendetti's response also stated:

> "This request for me to work from the Chicago office for 2 weeks each month for 'routine'

> accounting operations is something that was not discussed when I first joined Compass. I have no problem being in Chicago for 'non-routine' operations or projects such as the work we had to do with system selection, conversions or audit. . . . I do not mind spending 2 to 3 days (maximum) in Chicago each month and how you'd like to use my time would be at our discretion."

(*Id.*). Vendetti also explained that he could do much of the work in the Stone Mountain office anyways, because "[Compass] is built on managing tasks and responsibilities remotely." (*Id.*).

That same afternoon, Dubnicka emailed Vendetti a response "reserv[ing] comment on the bulk" of the email until a later time and expressing his disappointment that Vendetti was not in the Chicago office that day. (*Id.*). In addition, Dubnicka felt that Vendetti's absence showed a "total lack of respect for Compass and its needs" and he reiterated that Vendetti needed to be in Chicago both that week and the following week. (*Id.*). Dubnicka forwarded Vendetti's email to Compass executives, commenting that Vendetti's actions bordered on insubordination and that he was "sure [Vendetti's] employment agreement does not give him the right to refuse to come here two weeks a month." (*Id.*).

On April 18, Vendetti traveled to the Chicago office and met with Dubnicka and Broderick, Compass's attorney, and Dubnicka's April 19, 2006 email summarized what took place at that meeting. (Compl. Ex. 4). Dubnicka reiterated his disappointment that Vendetti had not come to Chicago the previous day as directed and stated that this amounted to insubordination and grounds for termination for cause. (*Id.*). He wrote that the cross-training could not be done remotely and confirmed Vendetti's next agreed upon trip to Chicago for the week of April 24th. In addition, he mentioned the need for Vendetti to "be in Chicago for the last two weeks of May and each month thereafter for the foreseeable future." (*Id.*).

5

Vendetti tendered his notice of termination for "Good Reason" pursuant to Section 5(f) of the Agreement early in the morning on April 21, 2006, to become effective May 21, 2006. (Compl. Ex. 5; Pl. Facts ¶39-¶40; Def. Facts ¶38). He explained that Compass's instruction that he "work out of the Chicago office two (2) weeks each month for the indefinite future" amounted to a material breach of Section 1(c) of the Agreement. (Compl. Ex. 5). Following a meeting with Broderick and Dubnicka that same day, Vendetti sent an email informing Dubnicka that while he would be willing to travel to Chicago the following week of April 24th, this depended on Compass's response to his notice of termination. (Dubnicka Depo. Ex. 8).

On April 21, 2006 Broderick emailed Vendetti stating that Compass would respond to his notice of termination at a later date. (Pl. Facts ¶42; Def. Facts ¶40). Th email confirmed Vendetti's unwillingness to travel to Chicago until Compass responded to his notice, even though he had agreed that he would come to Chicago to complete the 2005 audit, March closing, and cross-training of Chicago employees. (Broderick Depo. Ex. 7). Broderick reiterated that Compass still expected Vendetti to be in Chicago on Monday, April 24, 2006. (*Id.*).

Vendetti responded to Broderick's email that same day stating that the demand that he be in Chicago that week was "part and parcel" of the previous demand that he work in Chicago for two weeks per month for the indefinite future, and therefore, his willingness to travel to Chicago "this, or any future week" depended on Compass's response to his notice of termination. (*Id.* at Ex. 9). Vendetti also believed that the three tasks he was required to perform in Chicago could be performed remotely from his Stone Mountain office. (*Id.*).

Later that same day, Broderick sent a formal response to Vendetti's notice of termination

6

disagreeing that Vendetti had "Good Reason" to terminate the Agreement. (Compl. Ex. 6; Def. Facts ¶41; Pl. Facts ¶45). Broderick specifically stated that "the Company has not requested, nor is it requesting, you to change your Principal Location. Your supervisor requested that you be in the Chicago office for specific periods of time for specific tasks that had an unknown date of conclusion." (Compl. Ex. 6; Pl. Facts ¶45). Broderick concluded the letter by stating that he would be available during Vendetti's stay in Chicago to discuss the matter. (Compl. Ex. 6). Vendetti did not travel to Chicago and did not respond to this letter, and neither Broderick nor Dubnicka did anything to change or countermand the instructions that Vendetti come to the Chicago office two weeks per month. (Pl. Facts ¶51).

On May 19, 2006, Vendetti emailed Broderick a reminder that his resignation would take effect two days later and that the demand that he work in Chicago two weeks per month was still in effect. (Pl. Facts ¶54; Def. Facts ¶44; Broderick Depo. Ex. 16). Broderick responded disagreeing with Vendetti's allegations and accusing Vendetti of repeated insubordination. (Pl. Facts ¶55; Def. Facts ¶44; Broderick Depo. Ex. 17). Vendetti's resignation took effect on May 21, 2006 and his attorney sent a letter to Compass on May 26, 2007 demanding severance pay under Section 6 of the Agreement. (Pl. Facts ¶56; Def. Facts ¶45; Compl. Ex. 7).

On June 6, 2006, Vendetti filed a two-count complaint alleging breach of contract and violation of the Illinois Wage Payment and Collection Wage Act, 820 Ill. Comp. Stat. 115/1 *et. seq*. On December 12, 2006, we granted Compass's motion to dismiss Vendetti's Wage Act claim because he had essentially pled himself out of the Act's coverage.

On January 10, 2007, Compass filed a motion for judgment on the pleadings arguing that

7

under Sections 5(e) and 6(b) of the Agreement, Vendetti was required to give ninety days notice of termination. We denied Compass's motion on March 2, 2007, finding that Section 6(b) applies to an employer "request" that Vendetti change his office location, whereas Section 6(c) applies to an employer demand. Therefore, we found that thirty days notice was sufficient.

On August 30, 2007 the parties filed cross motions for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (internal quotations omitted).

Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

Vendetti alleges that Compass breached the Agreement by requiring him to travel to Chicago two weeks per month. Compass denies that it breached the Agreement and alleges that, even if it had, Vendetti is precluded from recovering because he materially breached the Agreement due to insubordination and failed to give Compass an opportunity to cure its breach. To resolve these issues we must analyze the meaning of the Agreement itself, whether Compass materially breached the Agreement, and if so, whether Vendetti's subsequent actions preclude his recovery. We handle each of these issues in turn below.

**A. Section 1(c) of the Agreement**

Vendetti argues that Compass breached Section 1(c) of the Agreement. Section 1(c) states: "Unless otherwise mutually agreed to, [Vendetti] shall be located in his current company office location (the 'Principal Location') during the Term or such other office located within 45 miles of the Principal Location." (Compl. Ex. A at 2.). The parties disagree regarding the meaning of this section.

The interpretation of a contract, such as the Agreement in this case, is "particularly suited to disposition by summary judgment." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998). "When interpreting written contracts, we initially determine, as a matter of law, whether the contract is ambiguous or unambiguous. Ambiguity exists if a provision is subject to reasonable alternative interpretations." *Id.* at 420 (internal citations omitted). If we find "that the pertinent provisions of the contract are unambiguous, [we] need not consider extrinsic evidence," but may instead "declare the meaning of those provisions." *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir. 1989).

9

Each party argues that the unambiguous language of this section supports its interpretation. Vendetti argues that the phrase "Executive shall be located in his current company location" refers to where Vendetti himself is located, not merely where his office is located. Additionally, because at the time of contracting Vendetti's "current company location" was Stone Mountain, Georgia, this provision meant that he would be located within forty-five miles of the Stone Mountain office unless otherwise "mutually agreed."[3] Compass responds that this section doesn't refer to where Vendetti himself is located, but instead to where his office is located. Compass focuses upon the dictionary definition of "Principal Location," and then differentiates between business travel and "relocation," arguing that spending two weeks per month in Chicago does not amount to a "relocation."

Upon review of the Agreement, we find that the unambiguous language supports Vendetti's interpretation because Section 1(c) clearly refers to the location of "*the Executive*" and not the location of his *office*. This interpretation is supported by the parties' use of alternative language in Section 6(b). In our March 2, 2007 decision, we interpreted "request to move place of employment" in Section 6(b) to mean that if Compass requests that Vendetti changes offices, then he may receive severance upon ninety days notice. By contrast, we held that Section 1(c) applies to demands, and not mere requests, that Vendetti change locations. While our opinion did not mention other differences between these sections, it is clear that Section 1(c) refers to where Vendetti is located, while Section 6(b) refers to the location of his "place of employment." The differences between

---

[3] Vendetti also relies upon Section 1(a) and 1(b) of the Agreement, which state that his official title was "Controller-Williams" and that he was to report directly to the Board of Directors, to support his argument that he was only meant to perform tasks in Stone Mountain, Georgia and that Dubnicka did not have the authority to order him to relocate. (Compl. Ex. 1 at 2). We need not decide these issues because the language of Section 1(c) is dispositive of the issue.

these two sections demonstrate that when the parties meant to refer to office relocation they knew how to do so, and in fact, did so using the phrase "place of employment." It also demonstrates the importance of Vendetti's location within the contract because not only does a demand that he travel outside of Stone Mountain trigger severance, but also a mere request that he change offices.

In addition, while Compass is correct that Section 1(c) refers to Vendetti's "Principal Location." However, Compass's reliance on the dictionary definition of this term is misplaced because the parties here are using that phrase as shorthand for "current company location." *See Alexian Bros. Health Providers Ass'n, Inc. v. Humana Health Plan, Inc.*, 330 F. Supp. 2d 970, 975 (N.D. Ill. 2004). The use of underlining, quotation marks, and parentheses following a phrase is typically used to provide a shorthand way to reference the phrase later within the same document, and the parties have used this format throughout their contract.[4] Thus, consistent with the way that the parties have defined other terms in their contract, the term "Principal Location" here is just shorthand for "current company location," which in this case was Stone Mountain, Georgia at the time of contracting. Thus, the dictionary definition of "principal" is irrelevant.

Compass also argues that this interpretation defies commonsense because it would permit an employee to veto all travel requests. However, "where language is unambiguous, we ignore it only in 'the rare care where literal application of a text would lead to absurd results or thwart the obvious intentions of its drafters.'" *Grun*, 163 F.3d at 420 (quoting *Marlowe v. Bottarelli*, 938 F.2d 807, 912 (7th Cir. 1991)). For example, we can ignore unambiguous language where there is clear

---

[4] For example, the very first sentence of the Agreement contains three similar definition formats. The Agreement defines "this Employment and Non-Compete Agreement" as "(this 'Agreement')," "Compass Environmental, Inc., a Delaware Corporation" as "(the 'Company')" and Ronald Vendetti as "(the 'Executive')." (Compl. Ex. A at 1).

11

proof of mutual mistake. *Id.* at 421. Here, it is not necessarily absurd to find that an employee might hinge his employment upon assurances that he would not have to travel extensively without his consent. In addition, the intentions of the drafters in this case are by no means "obvious" and there is no evidence of mutual mistake.[5] Regardless of what occurred during these negotiations, however, there is no evidence of mutual mistake which might warrant ignoring the unambiguous language.

Finally, Compass relies on *Peach v. Ultramar Diamond Shamrock*, 229 F. Supp. 2d 759 (E.D. Mich. 2002) and *Reilly v. Polychrome Corp.*, 872 F. Supp. 1265 (S.D.N.Y. 1995) to argue that the travel required in this case is not barred by the Agreement because it did not amount to a "relocation." However, these arguments are inapposite given the fact that the plain language of the Agreement bars demands for travel without Vendetti's consent. In contrast, neither of the employment agreements in *Peach* and *Reilly* refer to where the employee himself is located, but instead to where the employee's office is located. *See e.g., Peach*, 229 F. Supp. 2d at 762 (referring to "a relocation of the Participant's principal business location to an area outside a forty (40) mile radius of the Participant's current principal business location"); *Reilly*, 872 F. Supp. 1265, 1267 (S.D.N.Y. 1995) (requiring consent "before any change of [the plaintiff's] principal office could be made").

---

[5] While it is uncontested that Compass's attorneys prepared the initial draft of the Agreement and that Vendetti did not request any changes to this draft, the extent of the negotiations prior to the initial draft is disputed. Vendetti claims that during negotiations he expressed his initial concerns that because Compass was headquartered in Chicago, his new job might demand excessive travel, which would put strain on his personal life. (Vendetti Decl. ¶7). Compass disputes this contention and argues that Section 1(c) was mere boilerplate language that was in all four ex-William executives' contracts. (Def. Resp. Pl. Facts ¶11-¶13).

12

## B. Breach of Contract

Given this unambiguous language, we must now determine whether Compass breached the Agreement. The contents of Dubnicka's March 31, 2006 email to Vendetti are uncontested. The email demanded that Vendetti spend two weeks per month for the "indefinite" future in the Chicago office and this demand was never rescinded after Vendetti gave his notice of termination.

Compass argues it did not breach the agreement because neither "indefinite" nor "foreseeable" denote a permanent arrangement, and therefore Dubnicka never demanded that Vendetti permanently relocate to Chicago. While we disagree with Compass's interpretation of the words "indefinite" and "foreseeable," we need not decide whether the travel arrangement was meant to be permanent. Even if Dubnicka did not explicitly ask Vendetti to permanently relocate to Chicago, he did demand that Vendetti come to Chicago for two weeks every month, thus violating the plain language of Section 1(c), which required that Vendetti be located in his "current company location," Stone Mountain, Georgia, unless otherwise agreed.

## C. Vendetti's Alleged Insubordination

Given that Compass breached the Agreement, we next consider whether Vendetti's alleged insubordination after he gave his notice of resignation nonetheless precludes his recovery. Compass argues that even if it breached the Agreement, Vendetti's actions amounted to insubordination because he refused to travel to Chicago the week of April 24th as agreed, thus breaching Section 1(b) of the Agreement. This section required that Vendetti "devote his best efforts and substantially all of his business time, attention, energy, and skill to performing his duties." (Compl. Ex. A at 1). Compass urges that Vendetti's failure to report to work in Chicago justifies his termination for cause

13

under Section 5(b) of the Agreement, and therefore, he should be precluded from recovering severance for Compass's breach. Vendetti responds that he was defending his contract rights, and therefore, his actions did not amount to insubordination.

An employee is "subject to a duty to obey all reasonable directions in regard to the manner of performing a service that he had contracted to perform." Restatement (Second) of Agency § 385(1); *see also* 9 Williston, Contracts § 1013B. However, if an employer demands a material change in an employee's duties, outside the scope of the employment contract, then "acts done by the employee in defense of his contract rights . . . are not insubordination." *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1 (N.Y. 1971); *see also Circle Agency, Inc. v. Ross*, 107 Ill. App. 3d 195, 437 N.E.2d 667 (5th Dist. 1982). Thus, we must determine whether Compass's request was "reasonable" and in conformance with the Agreement.

In *Circle Agency, Inc. v. Ross*, an employee's refusal to travel did not amount to insubordination because the employer's demand exceeded the scope of his employment contract. *Id.* at 204. The court acknowledged that an employee must obey his employer's "reasonable requests," however, because the employment contract specifically limited the scope of Ross's duties if his health deteriorated, his health constituted "a major contractual limitation on Circle's demands" and his failure to obey these demands due to his poor health was excused. *Id.* Similarly, Compass's demand that Vendetti travel to Chicago for the week of April 24th exceeded the scope of the Agreement. As stated above, under Section 1(c) of the Agreement, Vendetti was to be located in Stone Mountain, Georgia for the duration of his contract unless he agreed otherwise. Thus, Compass's order that Vendetti travel to Chicago was not a "reasonable direction" that Vendetti was

14

required to obey, and his failure to obey cannot be deemed insubordination.[6]

## D. Opportunity to Cure

Compass's final argument is that Vendetti should be denied severance because he refused to give Compass a reasonable opportunity to cure its breach. In Broderick's April 24, 2006 letter to Vendetti he stated that he would be available in Chicago to discuss the matter further. (Compl. Ex. 6). Because Vendetti did not travel to Chicago or reply to Broderick's invitation, Compass argues that Vendetti "thwarted" any attempts by it to cure the breach because in order to "effect a 'cure,' Compass needed to sit down with Plaintiff, discuss the business at hand, and reach a resolution." (Def. MSJ Reply at 15). Vendetti responds that he was not required to travel to Chicago to meet with Broderick under the Agreement and that Compass could have discussed the matter with him at anytime via telephone or mail during the thirty-day period.

To determine Vendetti's obligations we must look to the language of the contract. *See* 19 Williston on Contracts § 54:48 (4th ed.) ("The employment contract itself may contain a provision stating that notice of a certain length is necessary or sufficient to terminate it, and these provisions are controlling."). Under Section 5(f) of the Agreement, Vendetti could terminate the Agreement after "the occurrence and continuance for thirty (30) days after written notice from Executive to the Company of any material breach by the Company of any provision of this Agreement after failing

---

[6] Other facts in this case also support Vendetti's lack of insubordination. For example, on April 21, 2006 Vendetti specifically told Compass that he would be willing to travel to Chicago, however, his trip would depend upon Compass's response to his notice of termination, to which Compass did not formally respond until April 24th, and there was no further communication between the parties until May 19, 2006. In addition, Vendetti continued to report to work in Stone Mountain and remotely performed some of the duties that he would have performed in Chicago.

to cure such breach." (Compl. Ex. A at 6). There is no dispute that Vendetti gave his notice of termination on April 21, 2006. In addition, Compass never rescinded or countermanded its demand that Vendetti travel to the Chicago office two weeks per month. While Compass may have invited Vendetti to speak with Broderick in Chicago, he was not obligated under his contract to travel to Chicago for the week of April 24th, as stated above, and he was not obligated under his contract to take further actions after giving his notice of termination to assist Compass in curing its own breach. This is especially true given that Vendetti's failure to accept the invitation to discuss matters in Chicago did not prevent Compass from curing its breach through other channels of communication at any time during the thirty-day notice period prescribed in the Agreement. Because Compass neglected to do so, Vendetti validly terminated his Agreement and is entitled to severance.

**E. Damages**

Vendetti argues that he is entitled to severance pay, prejudgment interest, and attorney's fees. We address each of these requests in turn below.

*1. Severance*

First, we hold that Vendetti is entitled to severance pay. Due to Compass's breach, Vendetti validly terminated the Agreement pursuant to Section 5(f). Section 6(c) applies when the Agreement is terminated pursuant to Section 5(f), and states that "the Company shall pay to Executive severance pay equal to Executive's then existing Base Salary at such time and in such manner (including subject to all required deductions) . . . for a period beginning on the date following the date of termination and ending twelve (12) months following the date of termination." (Compl. Ex. A). Vendetti claims his salary was $110,000 upon termination, but Compass contests this fact, stating

16

that it is unclear whether his compensation was $100,000 or $110,000. (Def. Resp. Pl. Facts ¶7). Because this is a contested fact and not obvious from the record before us, we will not decide the amount of severance awarded on summary judgment. Instead, the parties should confer to determine Vendetti's final compensation before termination.

### 2. *Prejudgment Interest*

Additionally, Vendetti argues that he is entitled to prejudgment interest of five percent per annum, or a higher equitable rate if we deem it warranted, on his owed unpaid compensation. Under the Illinois Interest Act, 815 Ill. Comp. Stat. 205/2 (2007), "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing." Because this case involves an employment contract it satisfies the "instrument of writing" requirement. Additionally, the amount due is readily ascertainable from Section 6(c) of the Agreement. *See Ameritech Info. Sys. v. Bar Code Resources, Inc.*, 331 F.3d 571, 575 (7th Cir. 2003) ("The creditor must, however, prove that the money due was a liquidated amount or subject to easy computation."). Therefore, Vendetti is entitled to prejudgment interest at the statutory rate of five percent per year on his unpaid salary from the date of termination, May 21, 2006, until twelve months thereafter.

### 3. *Attorney's Fees*

Finally, Vendetti contends that he is entitled to attorney's fees under the Illinois Attorneys' Fees in Wages Actions Act, 705 Ill. Comp. Stat. 225/1 (2007). Section 225 of the Act states that:

> "[w]henever . . . [an] employee brings an action for wages earned and due and owing according to the terms of the employment, and establishes by the decision of the court or jury that the amount for which he or she has brought the action is justly due and owing, and that

17

> a demand was made in writing at least 3 days before the action was brought, for a sum not exceeding the amount so found due and owing, then the court shall allow to the plaintiff a reasonable attorney fee of not less than $10, in addition to the amount found due and owing for wages, to be taxed as costs of the action."

*Id.* Courts have held that "in order to recover under this Act, a plaintiff must strictly comply with its provisions." *Anderson v. First Am. Group of Companies, Inc.*, 353 Ill. App. 3d 403, 413, 818 N.E.2d 743, 751-52 (1st Dist. 2004). Additionally, the written demand must include a specific sum claimed to be owing. *Catania v. Local 4250/5050 of the Commc'ns Works of Am.*, 359 Ill. App. 3d 718, 728, 834 N.E.2d 966, 975 (1st Dist. 2005). Here, Vendetti's attorney's May 26, 2006 letter satisfies the written demand requirement. Not only was it sent more than three days before Vendetti brought this action, but also it includes the specific amount of compensation that Vendetti was demanding. (Compl. Ex. 7). Additionally, Compass does not dispute that Vendetti complied with the procedural requirements of this Act. (Def. Opp. to Pl. MSJ at 9-10). Therefore, we find that Vendetti is entitled to attorney's fees, however, the specific amount of attorney's fees compensable under the Act remains unresolved. The parties should confer to determine the appropriate amount of attorney's fees in this case.

## CONCLUSION

For the reasons described above, we deny Compass's Motion for Summary Judgment and grant Vendetti's Motion for Summary Judgment. We retain jurisdiction solely as to the two remaining issues, the amount of severance pay and attorney's fees, and refer them to Magistrate Judge Keys in the event that the parties are unable to resolve these issues mutually. However, we will retain jurisdiction with respect to these two issues if our further assistance is required.

It is so ordered.

MARVIN E. ASPEN
                                                            United States District Judge
Date: November 26, 2007